IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Cynthia Lynn Verble, | ) | C/A No. 0:14-2516-TLW-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This social security matter is before the court for a Report and Recommendation pursuant to Local Civil Rule 83.VII.02 (D.S.C.). The plaintiff, Cynthia Lynn Verble, brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the defendant, Acting Commissioner of Social Security ("Commissioner"), denying her claims for Disability Insurance Benefits ("DIB"). Having carefully considered the parties' submissions and the applicable law, the court concludes that the Commissioner's decision should be affirmed.

## SOCIAL SECURITY DISABILITY GENERALLY

Under 42 U.S.C. § 423(d)(1)(A) and (d)(5), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); see also Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1973). The regulations require the ALJ to consider, in sequence:

(1)    whether the claimant is engaged in substantial gainful activity;

(2)    whether the claimant has a "severe" impairment;

(3)    whether the claimant has an impairment that meets or equals the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"), and is thus presumptively disabled;

(4)    whether the claimant can perform her past relevant work; and

(5)    whether the claimant's impairments prevent her from doing any other kind of work.

20 C.F.R. § 404.1520(a)(4).[1]  If the ALJ can make a determination that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  Id.

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments.  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience, and impairments, to perform alternative jobs that exist in the national economy.  42 U.S.C. § 423(d)(2)(A); see also McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983); Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980).  The Commissioner may carry this burden by obtaining testimony from a vocational expert.  Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983).

---

[1] The court observes that effective August 24, 2012, ALJs may engage in an expedited process which permits the ALJs to bypass the fourth step of the sequential process under certain circumstances.  20 C.F.R. § 404.1520(h).



## ADMINISTRATIVE PROCEEDINGS

In July 2011, Verble applied for DIB, alleging disability beginning October 1, 2010. Verble's application was denied initially and upon reconsideration, and she requested a hearing before an administrative law judge ("ALJ"). A hearing was held on March 6, 2013, at which Verble, who was represented by Beatrice Whitten, Esquire, appeared and testified. The ALJ issued a decision on March 28, 2013 finding that Verble was not disabled. (Tr. 11-22.)

Verble was born in 1966 and was forty-four years old on December 10, 2010—the date Verble testified she stopped working full time. (Tr. 31, 49-50, 142.) She has a high-school education and has past relevant work experience as a cafeteria manager. (Tr. 191.) Verble alleged disability due to multiple sclerosis, fibromyalgia, insomnia, carpal tunnel syndrome, hypertension, degenerative disc disease, anxiety, neurocardiosyncope, "restless medication," and irregular heartbeat. (Tr. 190.)

In applying the five-step sequential process, the ALJ found that Verble had not engaged in substantial gainful activity since December 10, 2010—the date Verble testified she stopped working full time. The ALJ also determined that Verble's multiple sclerosis and fibromyalgia were severe impairments. However, the ALJ found that Verble did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listings"). The ALJ further found that Verble retained the residual functional capacity to

> perform less than the full range of sedentary work as defined in 20 CFR 404.1567(a). Specifically, the claimant can lift and carry up to 10 pounds occasionally and lesser amounts frequently. She can sit for 6 hours in an 8-hour workday and stand and/or walk occasionally. The claimant can only occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl. She can never climb ladders, ropes or scaffolds.



> Additionally, the claimant must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, and fumes, odors, dusts, gases and poor ventilation. She must avoid all exposure to hazards.

(Tr. 17-18.) The ALJ found that Verble was unable to perform any past relevant work, but that considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Verble could perform. Therefore, the ALJ found that Verble was not disabled from December 10, 2010 through the date of his decision.

The Appeals Council denied Verble's request for review on April 25, 2014, making the decision of the ALJ the final action of the Commissioner. (Tr. 1-3.) This action followed.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also 42 U.S.C. § 405(g); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Thus, the court may review only whether the Commissioner's decision is supported by substantial evidence and whether the correct law was applied. See Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig, 76 F.3d at 589. In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Id.

PJG

Accordingly, even if the court disagrees with the Commissioner's decision, the court must uphold

it if it is supported by substantial evidence. Blalock, 483 F.2d at 775.

## ISSUE

Verble raises the following issues for this judicial review:

I.      The ALJ performed a flawed credibility analysis[;]

II.     The ALJ performed an improper listing analysis in evaluating mental disorders[;]

III.    The ALJ failed to properly consider the combined effects of impairments[;]

IV.     The ALJ performed an incomplete and flawed RFC analysis[;]

V.      The ALJ performed an improper review of the evidentiary record[.]

(Pl.'s Br., ECF No. 12.)

## DISCUSSION

**A.      Subjective Complaints**

Verble first argues that the ALJ erred in evaluating her subjective complaints. In evaluating

subjective complaints, the United States Court of Appeals for the Fourth Circuit has stated that "the

determination of whether a person is disabled by pain or other symptoms is a two-step process."

Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). It appears that in this matter only the second step

is at issue,[2] during which the ALJ must expressly consider "the intensity and persistence of the

claimant's [symptom] and the extent to which it affects her ability to work." Id. In making these

determinations, the ALJ's decision "must contain specific reasons for the finding on credibility,

---

[2] The first step requires there to "be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig, 76 F.3d at 594 (internal quotation omitted).



supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. "[A]llegations concerning the intensity and persistence of pain or other symptoms may not be disregarded *solely* because they are not substantiated by objective medical evidence." Id. (emphasis added). "This is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work." Craig, 76 F.3d at 595. A claimant's subjective complaints "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the [symptoms] the claimant alleges she suffers." Id. The social security regulations inform claimants that in evaluating subjective complaints, the Commissioner will consider the following relevant factors:

(i)  Your daily activities;
(ii)  The location, duration, frequency, and intensity of your pain or other symptoms;
(iii)  Precipitating and aggravating factors;
(iv)  The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v)  Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi)  Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii)  Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).



The ALJ summarized Verble's testimony as to her alleged disabling conditions as follows:

At the hearing, the claimant testified she last worked in December 2010 as a school cafeteria manager. She stated she ceased working due to her decreased stamina, fatigue and difficulty walking and lifting objects. She reported she experiences bilateral leg weakness and pain after walking short distances and that she has difficulty balancing and sometimes falls. The claimant testified she also experiences back, arm and hand pain and has difficulty picking up a coffee cup. She stated she has to rest for approximately one hour after vacuuming and that she does not cook. She reported she experiences flares of her fibromyalgia on a daily basis and she has difficulty standing and sitting for extended periods. The claimant maintained she has not experienced any relief of her symptoms from physical therapy or medications.

The claimant testified she has difficulty sleeping and uses a CPAP machine. She reported she experiences anxiety and depressive symptoms and that she is intolerant to antidepressant medications. She stated she experiences irritability and has difficulty calming herself down due to her anxiety symptoms. The claimant testified she attempts to perform one household chore a day, whether it is making her bed or dusting the living room tables. She stated she sometimes goes to the grocery store and that she generally talks to her mother and daughter during the day. She reported she alternates between sitting, lying down and standing throughout the day.

(Tr. 17.)

In discounting Verble's testimony as to her alleged disabling conditions, the ALJ discussed the evidence of record. First, the ALJ summarized numerous treatment notes from November 2010 through December 2012 addressing Verble's multiple sclerosis ("MS"). Specifically, the ALJ observed that (1) "November 2010 treatment notes reflect that she denied any neurological symptoms including vertigo, visual loss, motor or sensory impairment, incontinence, gait disturbance and tremors" and her treating physician noted her MS was stable at that time; (2) in March 2011, an orthopedic physician noted that Verble "exhibited some numbness of the right lower extremity, but he did not document any gait abnormalities"; (3) in March 2011, a cervical spine MRI showed no MS plaques or other significant abnormality and although Verble's brain MRI showed right-sided MS plaques, her treating neurologist did not document any significant abnormalities upon physical

examination, noting that while Verble walked slowly with a wide-based gait and demonstrated some give way testing of the right upper extremity, Verble demonstrated no tremor and no weakness of the lower extremities and concluding that Verble demonstrated no evidence of a recent MS exacerbation; (4) in April and May 2011, Verble's treating neurologist noted that Verble's MS appeared to be stable and that Verble reported in May 2011 that she had recently returned to work; (5) although Verble reported fatigue and difficulty performing her job duties, she also stated she had been caring for her 18-month-old granddaughter; (6) in May 2011, Verble exhibited some right upper and right lower extremity weakness but she was able to tandem walk, and no gait abnormalities were documented; (7) in June 2011, follow-up treatment notes reflected that Verble ambulated with a normal gait, demonstrated no weakness of the extremities, and reported some fatigue at that time but otherwise denied any recurring neurologic symptoms; (8) September 2011 treatment notes reflected that Verble declined immune modulating therapy for her MS, and although she demonstrated some decreased grip strength and decreased rapid movements on the right, she otherwise demonstrated full strength of the extremities and a normal gait; (9) in January 2012, the treating neurologist noted that while Verble reported pain, fatigue, memory problems, and urinary urgency, Verble again declined immune modulating therapy, and he also documented that Verble ambulated with a slow gait but without ataxia and that Verble demonstrated full strength of the extremities; (10) in February 2012, a physician noted that Verble was only minimally symptomatic from an MS standpoint and no objective abnormalities were documented; (11) March 2012 treatment notes indicated that Verble denied any acute neurologic symptoms; (12) in August 2012, Verble reported lower extremity pain and was unable to tandem or heel/toe walk, but she ambulated without significant ataxia and without an assistive device and could toe walk; (13) in December 2012, Verble reported a loss of smell but



CT scans and MRIs of the brain revealed no acute abnormality and no changes in the chronic white matter abnormalities, and the examining physician noted that Verble's alleged loss of smell was not related to her MS; and (14) also in December 2012, a physical examination did not reveal any neurological abnormalities or strength deficits.  (Tr. 18.)  In sum, the ALJ stated that he had "considered [Verble's] MS and associated reports of fatigue in limiting the amount [she] can lift, carry, stand, walk, perform postural activities and be exposed to environmental conditions and hazards.  However, the objective examinations of record do not reflect any neurological deficits to suggest that [Verble's] MS imposes greater limitations than those set forth above."  (Tr. 18-19.)

The ALJ also summarized numerous treatment notes from November 2010 through December 2012 addressing Verble's fibromyalgia.  Specifically, the ALJ observed that (1) in November 2010, Verble's treating neurologist noted that Verble ambulated with a normal gait and while the neurologist noted that Verble demonstrated slightly decreased grip strength and decreased rapid movements in her right upper extremity, he otherwise noted Verble exhibited no strength deficits; (2) in March and April 2011, the treating neurologist documented that Verble ambulated with a slow and wide-based gait but that she did not use an assistive device or demonstrate any weakness of the upper extremities; (3) in June 2011, Verble reported fatigue but ambulated with a normal gait and exhibited no weakness of her extremities; (4) a January 2012 physical examination reflected that Verble walked slowly but without ataxia, and no other objective abnormalities were documented; (5) April and October 2012 physical examinations did not reflect any significant tenderpoints or weakness; and (6) in December 2012, Verble's treating physician noted that she demonstrated no weakness of her extremities.  (Tr. 19.)  The ALJ also stated that there was "no evidence showing [Verble] subsequently sought significant treatment for her fibromyalgia-related



symptoms, and as noted above, physical examinations generally reflect that [Verble] exhibited full strength of the extremities with no tenderpoints and no significant gait abnormalities." (Id.) The ALJ noted that in Verble's February 2012 Function Report, she stated she could lift up to ten to fifteen pounds, which he found consistent with the residual functional capacity assessment. In sum, the ALJ found that while he had "considered [Verble's] fibromyalgia and her subjective reports regarding her limited ability to stand and walk in limiting the amount she can lift, carry, push, pull, and perform postural activities, there are no objective abnormalities suggesting [Verble's] fibromyalgia has resulted in greater limitations than those set forth [in the residual functional capacity assessment]." (Id.)

The ALJ also separately addressed Verble's reports of fatigue to her treating physicians, finding that "her reports of excessive fatigue are not corroborated by clinical findings, as the examiners generally noted the claimant was alert and oriented in all spheres. As noted previously, mental status examinations reflect that [Verble] exhibited good attention and concentration and could follow a 3-step command." (Id.) The ALJ reiterated that Verble's repeatedly declining immune modulating therapy for her MS suggested that her symptoms were not as limiting as she conveyed at the hearing. The ALJ also found that Verble's reports of persistent fatigue were inconsistent with "[her] reports that her mother lives with her and requires almost total care." (Id.) However, the ALJ stated that notwithstanding the above discussion he "considered [Verble's] reports of fatigue in limiting her to a reduced range of sedentary work with no exposure to hazards." (Id.)

Verble challenges a couple of the reasons offered by the ALJ to discount her credibility. Specifically, she first argues that the ALJ misrepresented the evidence when he stated that "November 2010 treatment notes reflect that [Verble] denied *any* neurological symptoms including



vertigo, visual loss, motor or sensory impairment, incontinence, gait disturbance and tremors." (Tr. 18) (emphasis added by Plaintiff). Verble alleges that she only denied those specific neurological symptoms and argues that MS has no set or standard symptoms, pointing out that fatigue is a common symptom. Verble further argues that the ALJ mistakenly believed that fatigue is a synonym for being tired. Thus, Verble argues that the ALJ improperly found that Verble denied any neurological symptoms as she complained consistently of fatigue and that he erred in making a medical conclusion that he had neither the training nor expertise to make. Moreover, Verble argues that at times she also complained of chronic pain, weakness and clumsiness in her extremities, and numbness and tingling in her legs.

As an initial matter, contrary to Verble's argument on this particular statement by the ALJ, the medical record referenced by the ALJ supporting this finding actually states that Verble reported "no acute neurologic symptoms including diplopia, vertigo, visual loss, motor or sensory impairment, incontinence, gait disturbance, [or] tremors." (Tr. 255; see also Tr. 399, 400, 745 (consisting of other treatment notes from the treating neurologist stating that Verble had "no recurring neurologic symptoms" or "no acute neurologic symptoms")). Further, as summarized in detail above, this statement was not the sole basis for discounting Verble's credibility with regard to her subjective complaints of limitations stemming from her MS. In fact, the ALJ discussed numerous medical records spanning the relevant time period, which included frequent references to Verble's reports of fatigue. Furthermore, within the ALJ's opinion, he discussed the medical opinion evidence, which included (1) a March 2011 opinion from Verble's treating neurologist that Verble should not work for four weeks, which the ALJ gave some weight to the extent that it suggested she was incapable of performing the heavy lifting of her prior job; (2) an April 2011 opinion from the

treating neurologist stating that Verble could not return to heavy physical activity, which the ALJ gave great weight; (3) a May 2011 opinion restricting Verble to light duty with a subsequent statement that she could advance her activities as needed, which the ALJ gave some weight; and (4) an October 2011 opinion from Verble's treating physician that she had only slight work-related mental limitations, which the ALJ gave significant weight. The court finds that all of the foregoing undermines Verble's arguments that the ALJ impermissibly "played doctor" or impermissibly substituted his judgment or opinion for that of Verble's doctors.

Furthermore, to the extent Verble argues that once she satisfied the first step of the two-step process in evaluating allegations of disabling pain or other symptoms that she was entitled to rely exclusively on subjective evidence to prove the intensity, persistence, and severity of the symptoms and that the ALJ erred by considering only the medical evidence, the court disagrees. In Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006), the Fourth Circuit stated: "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day," 453 F.3d at 565; however, the Hines Court acknowledged that " '[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered.' " Id. at 564 (quoting SSR 90-1p). Moreover, the Hines Court noted that

> [w]hile objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the



> extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

Id. at 565 n.3 (quoting Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1996)). Verble has failed to demonstrate that the ALJ erred in applying this law. In fact, the ALJ's decision repeatedly reflects that he partially credited her subjective complaints by limiting her to a reduced range of sedentary work (a range of work that was less demanding than the levels opined by her own physicians); however, he found that additional limitations were inconsistent with the evidence.

Thus, having carefully considered the parties' arguments and the record in this matter, the court finds that Verble has failed to demonstrate that the ALJ's evaluation of Verble's subjective complaints is unsupported by substantial evidence or controlled by an error of law. See Craig, 76 F.3d at 589 (defining "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance" and stating that the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]"); Blalock, 483 F.2d at 775 (indicating that regardless of whether the court agrees or disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence). Further, Verble has failed to demonstrate that the ALJ failed to properly apply the relevant factors in evaluating her credibility. See 20 C.F.R. § 404.1529(c)(3). In fact, the ALJ's decision reflects that he carefully considered the requisite factors in evaluating Verble's credibility throughout the decision. To the extent that Verble attempts to point to selective records that may



support her subjective complaints, the court may not substitute its judgment for the Commissioner's

and finds that the ALJ's conclusions are within the bounds of the substantial evidence standard. <u>See</u>

<u>Craig</u>, 76 F.3d at 595 (stating that a claimant's subjective complaints of pain itself or its severity

"need not be accepted to the extent they are inconsistent with the available evidence, including

objective evidence of the underlying impairment, and the extent to which that impairment can

reasonably be expected to cause the [symptoms] the claimant alleges she suffers"); <u>see</u> <u>also</u> <u>Hunter</u>

<u>v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1993) (*per curiam*) (finding that the ALJ may properly consider

inconsistencies between a plaintiff's testimony and the other evidence of record in evaluating the

credibility of the plaintiff's subjective complaints); 20 C.F.R. § 404.1571 (discussing consideration

of work a claimant has done during the period in which she believes she is disabled, even if it was

not substantial gainful activity, and indicating that it may show that the claimant is able to work at

the substantial gainful activity level).

**B.**    **Listing Analysis**

Verble next argues that the ALJ improperly evaluated her mental disorders in accordance

with section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1).[3]  The

disability regulations for evaluating mental disorders and section 12.00C of the Listing of

Impairments set out four broad functional areas for consideration, which are known as the

"paragraph B" criteria. Section 12.00C states that "[w]e measure severity according to the functional

---

[3] Although Verble indicates that her argument is directed at Step Three of the sequential analysis—which is whether the claimant has an impairment that meets or equals the requirements of an impairment listed in the Listings—Verble does not direct the court to any specific Listing that she contends she meets or equals.  Moreover, her arguments appear to be directed towards the ALJ's analysis at Step Two, where he found that Verble's mental impairments were non-severe.  However, regardless of which step of the sequential analysis this argument is properly directed toward, for the reasons that follow, Verble has failed to demonstrate any error warranting remand by the ALJ.



limitations imposed by your medically determinable mental impairment(s)."  20 C.F.R. Pt. 404,

Subpt. P, App. 1, § 12.00C.

Here, the ALJ first observed that there was no evidence that Verble had sought significant

treatment for her anxiety or depression since her alleged onset date, and there was no evidence that

she had been psychiatrically hospitalized.  The ALJ discussed three examinations and indicated that

a September 2011 examination revealed a worried/anxious mood and affect; that an October 2011

examination revealed a depressed mood/affect; and that an April 2012 consultative examination

assessed only pain disorder with psychological factors.  Further, the ALJ found that Verble had mild

limitations in activities of daily living, in social functioning, and in concentration, persistence, or

pace; and no episodes of decompensation.  Specifically, the ALJ found as follows:

> The first functional area is activities of daily living.  In this area, the claimant has
> mild limitation.  The claimant testified she performs very little household chores,
> such as vacuuming and making her bed, but she attributed her limited activities of
> daily living to her pain symptoms.  In her February 2012 Function Report, the
> claimant reported some difficulty caring for matters of personal hygiene, but again,
> she attributed her difficulty to her pain symptoms and not her psychological
> symptoms.  The claimant also indicated she sometimes grocery shops, prepares
> simple meals, vacuums, and does laundry.  There is no evidence showing the
> claimant has more than mild limitations in activities of daily living.

> The next functional area is social functioning.  In this area, the claimant has mild
> limitation.  In her February 2012 Function Report, the claimant denied that she has
> difficulty getting along with others.  In April 2012, while she reported she has
> difficulty having conversations with people due to her memory problems, the
> claimant stated she generally gets along well with others.  The consultative examiner
> noted she exhibited normal speech and had no difficulty holding a conversation.
> There is no evidence that the claimant has more than mild limitations in social
> functioning.

> The third functional area is concentration, persistence or pace.  In this area, the
> claimant has mild limitation.  Mental status examinations from September and
> October 2011 reflect that the claimant demonstrated good attention and
> concentration.  Additionally, in April 2012, the examiner noted the claimant could



spell "world" forwards and backwards, follow a 3-stage command and copy a geometric design. There are no concentration deficits documented in the medical record showing the claimant has more than mild limitations in this domain.

The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation which have been of extended duration.

(Tr. 15.)

Verble suggests that the ALJ erred in attributing her limitations in her activities of daily living to her pain, suggesting that if her pain were resolved there is no reason to conclude that her depression would not have created these or similar limitations. However, Verble fails to point to any evidence suggesting supporting such a finding other than pointing to a diagnosis of depression, and the court is unable to conclude that this finding is unsupported by substantial evidence.

Verble argues that the ALJ erred in finding that Verble's ability to get along with others was an appropriate standard in examining social functioning. Verble also argues that the statement should be considered in the context that Verble was unable to go out into society and interact with a wide variety of individuals due to her physical condition. Finally, Verble argues that the ALJ erred in relying on findings from a one-time consultative examination to discount Verble's reports that she has difficulty having conversations with people due to her memory problems and that the ALJ should have deferred to her subjective testimony in this area. Section 12.00C(2) describes social functioning as referring

to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others,



> communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C(2). Thus, the ability to get along with others is appropriately considered. Moreover, as detailed above, Verble has failed to demonstrate that the ALJ erred in discounting her subjective complaints in this matter.

Verble argues that the events that the ALJ relied upon in finding mild limitations in concentration, persistence, or pace were limited events and at odds with Verble's reports to her physicians that she went to work without remembering what she had done during the course of the day and being unable to complete forms and paperwork required as part of her work duties. Verble reiterates that the ALJ should have deferred to Verble's subjective reports and testimony regarding this functional area. However, as discussed by the ALJ, although examinations indicated depressed or anxious mood, Verble had full orientation, intact thought processes and appropriate thought content, good attention and concentration, and good memory. (Tr. 14, 574, 575, 717.) Verble's arguments regarding the ALJ's consideration of her subjective reports fails for the reasons discussed above.

Finally, Verble argues that because the ALJ erred in evaluating the first three areas, he failed to properly and fully analyze the final area, regarding episodes of decompensation. She further argues that she did experience numerous episodes of decompensation.

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may



> be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C(4).  As Verble has failed to show that the ALJ erred in finding no more than mild limitations in her other areas of adaptive functioning, she cannot demonstrate that the ALJ's determination in this area was unsupported by substantial evidence. Moreover, Verble does not point to any evidence that would result in the inference of episodes of decompensation as described above.

Therefore, based on the foregoing, Verble has failed to demonstrate that the ALJ's finding that Verble's mental impairments were non-severe is unsupported by substantial evidence or controlled by an error of applicable law.  See 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degree of your limitation in the first three functional areas [i.e., daily activities, social functioning, concentration] as "none" or "mild" and "none" in the fourth area [episodes of decompensation], we will generally conclude your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.").  Further, as noted above, Verble does not direct the court to any particular Listing that she believes the ALJ erred in failing to evaluate.

## C.    Combined Effects

Verble next argues that the ALJ erred in failing to consider her impairments in combination. When a claimant has more than one impairment, the ALJ must consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of



sufficient severity to be the basis of eligibility under the law.  20 C.F.R. § 404.1523.  Further, in

Walker v. Bowen, 889 F.2d 47, 49-50 (4th Cir. 1989), the United States Court of Appeals for the

Fourth Circuit explained:

> [A] failure to establish disability under the listings by reference to a single, separate
> impairment does not prevent a disability award.  It is axiomatic that disability may
> result from a number of impairments which, taken separately, might not be disabling,
> but whose total effect, taken together, is to render claimant unable to engage in
> substantial gainful activity.  In recognizing this principle, this Court has on numerous
> occasions held that in evaluating the effect[] of various impairments upon a disability
> benefit claimant, the Secretary must consider the combined effect of a claimant's
> impairments and not fragmentize them. . . . As a corollary to this rule, the ALJ must
> adequately explain his or her evaluation of the combined effects of the impairments.

Id. at 49-50 (internal citations omitted).  However, "the adequacy requirement of Walker is met if

it is clear from the decision as a whole that the Commissioner considered the combined effect of a

claimant's impairments."  Brown v. Astrue, C/A No. 0:10-cv-1584-RBH, 2012 WL 3716792, at *6

(D.S.C. Aug. 28, 2012) (citing Green v. Chater, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir.

1995)).

Verble argues that although the ALJ addressed some of her impairments in combination, the

ALJ failed to discuss all of her impairments in combination and that he did not fully consider the

impairments that he did discuss.  Specifically, Verble argues that although the ALJ considered her

degenerative disc disease, he failed to acknowledge her scoliosis; although he addressed her sleep

apnea, he failed to analyze the effects of her sleep deprived condition; similarly he failed to consider

the effects of her hypertension and mental conditions; he failed to consider her blurry vision and

drooping of her left eye; and he failed to consider how a disease that she was undergoing testing for

(myasthenia gravis) might impact her other impairments.  Verble argues that the cumulative impact

of her "laundry list of disorders" rendered her "incapable of living any semblence of a normal life"



(Pl.'s Br. at 29, ECF No. 14 at 29) and further it "defied logic" that Verble could be considered to have the residual functional capacity to do any work whatsoever. (Id. at 30.)

As an initial matter, Verble's arguments appear to be directed at the residual functional capacity assessment rather than the ALJ's determination that Verble's impairments do not equal a particular Listing, as Verble does not direct the court to any particular Listing that her impairments may equal. Regardless of which step of the sequential process Verble's arguments are directed towards, the court finds that, contrary to Verble's arguments, during the course of the ALJ's opinion he sufficiently discussed Verble's alleged impairments and limitations to demonstrate that he considered her impairments in combination.

The ALJ's opinion reflects that he discussed evidence related to Verble's back pain, including January 2011 x-rays that "revealed some degenerative changes, as well as some mild scoliosis" and noted that there was "no evidence showing the claimant sought significant treatment for her back pain after January 2011, and no abnormalities of the spine were documented upon physical examination." (Tr. 14.) As acknowledged by Verble, the ALJ found that her sleep apnea was well-controlled with her CPAP machine and found that fact suggested that "her sleeping problems are related to her insomnia or pain symptoms and not her sleep apnea." (Id.) The ALJ considered Verble's hypertension, explaining that Verble did not seek treatment for significant symptoms and that Verble has had essentially benign neurological and cardiovascular examinations. (Id.) Also as discussed above, the ALJ's decision analyzed Verble's mental conditions and concluded that they caused no more than minimal limitation in her abilities to perform work activities. The ALJ also stated that Verble "does not have an impairment or combination of

impairments that meets or medically equals the severity of one of the listed impairments . . . ." (Tr. 16.) The ALJ expressly stated that he

> considered the combined effects of the claimant's alleged impairments, both severe and non-severe, on the claimant's ability to work. 20 CFR 404.1526(b)(3) and 416.926(b)(3). While the combination of the claimant's MS, fibromyalgia, degenerative disc disease and carpal tunnel syndrome may affect her ability to lift, carry, stand, walk and perform postural activities, there is no indication in the record that the combination of the claimant's impairments imposes greater limitations than those inherent in the residual functional capacity set forth below.

(Id.) Moreover, in assessing Verble's residual functional capacity considering Verble's physical and mental impairments, the ALJ limited her to a reduced range of sedentary work. In analyzing Verble's residual functional capacity, the ALJ also discussed Verble's medical records at length, including physical and mental findings, diagnostic images and testing results, and opinion evidence, as well as her testimony, and addressed conflicts in the records. (Tr. 17-20.) Further, the ALJ explicitly states that the residual functional capacity finding

> is supported by the documentation of the claimant's MS and fibromyalgia. Although the evidence indicates the claimant's carpal tunnel pain resolved with surgery, I have considered the combination of the claimant's MS, fibromyalgia, degenerative disc disease and status post carpal tunnel release in limiting the amount she can lift, carry, stand, walk and perform postural activities. Moreover, due to any potential side effects from medications and to lessen the frequency of her MS and fibromyalgia flares, I find the claimant must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, and pulmonary irritants. Due to any potential side effects from the claimant's prescribed medications, her sleep apnea, and her subjective reports of fatigue, I find the claimant must avoid all exposure to hazards. However, I cannot find the claimant's allegation that she is incapable of all work activity to be credible.

(Tr. 20.) Finally, with regard to her allegations regarding myasthenia gravis, the record confirms that this test was negative (Tr. 725); therefore, it is unclear how that ALJ erred in failing to consider the possibility of any additional limitations from this disease.



Furthermore, to the extent that Verble's arguments in support of her position that additional limitations are warranted based on the combined effects of her impairments rests on Verble's subjective reports, as discussed in detail above, Verble has failed to demonstrate that the ALJ erred in evaluating her credibility.

For all of these reasons, the court finds the ALJ's analysis sufficiently demonstrates that he considered the combined effect of Verble's impairments.  See Brown v. Astrue, C/A No. 0:10-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012) (finding that Fourth Circuit precedent issued after Walker suggested that Walker was not meant to be used as a trap for the Commissioner).

## D.    Remaining Allegations of Error

Verble's remaining arguments that the ALJ's residual functional capacity assessement was incomplete and flawed and her argument that the ALJ performed an improper review of the evidentiary record hinge on her above arguments, primarily her first argument that the ALJ erred in evaluating her subjective complaints.  Moreover, contrary to Verble's argument that the ALJ "cherry-picked" the record by disputing the ALJ's interpretation of Verble's return to work in May 2011 and arguing that the ALJ mischaracterized Verble's situation in stating that she had been taking care of her 18-month-old grandchild, as discussed above, Verble has failed to demonstrate that the ALJ's decision, including the credibility analysis, is unsupported by substantial evidence.  Thus, as Verble has failed to demonstrate any error with regard to the ALJ's above analysis, she has failed to demonstrate that remand would be warranted for further consideration of these issues as well.



**RECOMMENDATION**

For the foregoing reasons, the court finds that Verble has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard.  See Craig, 76 F.3d at 589; see also 42 U.S.C. § 405(g); Coffman, 829 F.2d at 517. The court therefore recommends that the Commissioner's decision be affirmed.

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

October 7, 2015
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).